BEATTY, Justice.
This Court granted certiorari to consider whether the Court of Civil Appeals, 509 So.2d 222, was correct in holding that these petitioners were liable in plaintiff’s action under 42 U.S.C. § 1983, which reads:
“Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.”
We find that they were not liable, and we reverse the judgment and remand this cause.
At bottom is plaintiff’s claim that he was the victim of an unequal application of a *228 residence policy established by the Alabama Department of Public Safety, and that these defendants applied that unequal treatment to him. Such a view is not sustained by the record, however.
What the record does establish is that the Department of Public Safety operates through divisions. Pritchett was initially assigned to the driver’s license division located in Jackson County; while assigned there, he lived in Woodville, which is outside the police jurisdiction of Scottsboro, the county seat. In 1979, there was no departmental policy requiring driver’s license examiners to live within the police jurisdiction of their “duty station.” There was in existence, however, a policy requiring all “troopers” assigned to the highway patrol division to reside within the police jurisdiction of the city or “duty station” of their assignment. That policy was uniformly enforced upon the members of the highway patrol division at the time Pritch-ett applied for transfer from the driver’s license division to the highway patrol division in 1979. Pritchett was so informed and, in accord with that policy, took up residence in Scottsboro, his assigned “duty station.”
Maj. James Fuqua, who was chief of the highway patrol division at the time of Pritchett’s application for the transfer, explained the policy as it was applied to Pritchett:
“We discussed his request. We said we didn’t either have any objection to him coming into the enforcement division. That would be fine, but he would have to do like the other Troopers as far as where he lived. The other Troopers in that area all lived in Scottsboro. And Captain Holland advised me that Trooper Pritchett lived in Woodville. He said it would cause some bad problems, both for the Department and for the citizens, if he lived in Woodville instead of in Scotts-boro where the other Troopers lived. It was more centrally located in the county, being the fact the Troopers up there were on emergency call several nights a month. There is no car on duty after midnight. From midnight to six o’clock in the morning in Jackson County there’s no one out. Some Trooper has to be on call while he’s at home. If there is any wreck or anything else of an emergency nature, he’s called from his house and he has to respond to it. I was advised that Woodville was on a different telephone exchange and the calls that would be made from Scottsboro PD or the sheriff’s office in Jackson County would have to be made long distance. The response time, if the Trooper is going from Wood-ville to the northern part of the county or the other part of the county, could possibly be a life-threatening situation. And the other Troopers were required to live in Scottsboro. And one of those had already made a request to move out of Scottsboro to Woodville. It had been denied. And to treat Trooper Pritchett the same way the other Troopers were treated up there, he would have to move to Scottsboro.
“Q. You’re talking about Troopers who worked for you in the highway patrol division?
“A. Yes, sir.
“Q. Were the work requirements of the highway patrol Trooper the same or different from Troopers assigned to the other divisions within the Department?
“A. They are entirely different. Even Troopers within the highway patrol division have different type duties.
“Q. Would you please explain to the Court and jury some distinctions between the duties of a highway patrolman and a driver’s license trooper?
“A. The highway patrol Trooper that is assigned to accident investigations and traffic control, such as the six Troopers we are talking about in Jackson County, they are assigned to an area they are responsible for investigating accidents [sic]. And to enforce the traffic laws in that county. Respond to any other kind of emergency call, assist the sheriff and city police. It’s on a twenty-four hour basis, seven days a week, three hundred and sixty-five days a year to cover what has to be covered. A Trooper is off two days a week, plus the other leave. It’s an ongoing thing. Coverage has to be maintained on a continuous basis in the *229 highway patrol division. The driver’s license division, they give driver’s license tests usually in offices throughout the State. They start to work at eight o’clock in the morning. They have an hour off for lunch. Five o’clock in the afternoon their duties are through. They are not on call, nor do they have to respond to any emergency type situation at all. It really wouldn’t make any difference, that I could see, to the citizen or the Department of Public Safety, wouldn’t make any difference much where they lived as long as they were in the office at eight o’clock in the morning till five o’clock in the afternoon.
“Q. Most of the other divisions are [similar?]?
“A. Of course, ABI, Alabama Bureau of Investigation, these investigators investigate felonies, crimes, assist sheriffs, local police. Then again, they are not on call as far as any emergency type situations are concerned, accidents or anything. When they are called the crime has already been committed. Sometimes, usually a day or so before. It’s not an emergency situation with them. It’s more of an investigative type situation.”
That this was a subsisting policy was verified by Col. Jerry Shoemaker, director of the Department of Public Safety from March 1979 until January 1983:
“Q. Okay. You remember that when Trooper Pritchett was moved that you had a policy that all transfers, that you would approve no transfer without a move being part of the transfer, that they had to move into the city of their assignment?
“A. In the highway patrol division, that’s correct.
[[Image here]]
“Q. So even if Trooper Pritchett was transferred from driver’s license to highway patrol to carry out a policy of the Department at your request, he was still required to move to the city of his assignment?
“A. He was changing divisions and changing the whole intent of his job. He would have been required to live in the city of assignment, yes, sir.”
Pritchett continued to live in Scottsboro until sometime in April 1980, when, on his own initiative, he interpreted a memorandum issued by the Department of Public Safety as permitting him to move away from Scottsboro and back to Woodville. That memorandum follows:
“Effective May 1, 1980, all arresting officers and other department personnel utilizing state vehicles must reside within the police jurisdiction of the city in which they are assigned unless written permission is approved through the chain of command by the Director of Public Safety.
“Request for permission to live outside the police jurisdiction may be approved if it is for the convenience of the department or is not detrimental to the operation of the department.
“All personnel who remain in their present residence are exempt from this order until they change residences, are reassigned or transferred. However, due to economic conditions, it may soon be necessary for those employees not living within the police jurisdiction of the city of their assignment to provide their own transportation to and from work.”
The majority of the Court of Civil Appeals found that the evidence disclosed that, following the issuance of this memorandum, several officers and employees of the Department of Public Safety, three in particular, weré found to be living in areas other than the city to which they had been assigned. This evidence, that court concluded, established a conflict in the evidence sufficient to pose a jury question on the equal application issue, thus supporting the trial court’s denial of petitioners’ motions for a directed verdict and judgment notwithstanding the verdict. We respectfully disagree with that conclusion.
Perusal of the subject memorandum does not disclose any change in the pre-existing *230 residence policy as it was applied to troopers in the highway patrol division. To the contrary, it was clearly an attempt, due to rapidly rising gasoline prices at that time, to apply the pre-existing policy to all divisions of the department. Indeed, the language of the memorandum would have required Pritchett to remain in Scottsboro, absent written permission.
In any case, the evidence of selective enforcement primarily involved three persons, David Sterling, Mary Pamela Sterling, and Gary Tucker. The evidence affirmatively disclosed that David Sterling’s position in the highway patrol division was as a communications officer and, although he resided in Elmore County and had an office in Montgomery County, he was officially assigned to 18 highway patrol posts throughout the state. Thus, David Sterling was not a trooper similarly situated with Pritchett.
Mary Pamela Sterling, the wife of David Sterling, was employed by the Department of Public Safety as a driver’s license technician, not as a trooper in the highway patrol division; thus, she was not similarly situated with Pritchett.
Trooper Gary Tucker, an attorney, was shown by the evidence to be a special assistant attorney general assigned to the Department of Public Safety, with duties requiring that he travel throughout the state and make many court appearances in the various judicial circuits.
The other instances relied upon by plaintiff are to the same effect, and they establish conclusively that, in regard to others whose duties were similar to Pritchett’s duties, in no instance was there any unequal application of the residence policy of the department. Consequently, there was no evidence of a 42 U.S.C. § 1983 violation.
Having reached this conclusion, we find it unnecessary to address other issues raised by the petitioners.
Accordingly, the judgment of the Court of Civil Appeals is reversed, and this cause is remanded to that court with directions to enter an order consistent with this opinion. It is so ordered.
REVERSED AND REMANDED.
All the Justices concur.